Filed 5/16/17

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>VICTOR ALEXANDER MARQUEZ,<br><br>    Defendant and Appellant. | F070609<br><br>(Super. Ct. No. VCF222534)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Gary L. Paden, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Kathleen A. Kenealy, Acting Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein, Peter H. Smith, and Stephanie A. Mitchell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, only the Introduction, part 2 of the Discussion, and the Disposition are certified for publication.

# INTRODUCTION

Defendant Victor Alexander Marquez was just four months shy of his 18th birthday when he brutally murdered Maria Juarez by stabbing and slashing her 19 times during an attempted robbery. Judge Gerald F. Sevier presided over defendant's trial and sentenced him to life without the possibility of parole (LWOP) for special circumstance murder. While defendant's original appeal was pending, the United States Supreme Court decided *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*). *Miller* held that mandatory LWOP sentences for juvenile homicide offenders violated the federal Constitution's Eighth Amendment prohibition against cruel and unusual punishment. In defendant's first appeal, we recognized California does not provide for mandatory LWOP sentences for minors convicted of murder, and the sentencing court understood this aspect of its statutory sentencing discretion. Nevertheless, we reversed the judgment and remanded the matter to the trial court to reconsider defendant's LWOP sentence after applying the individualized sentencing criteria set forth in *Miller*. (*People v. Marquez* (June 25, 2013, F063837) [nonpub. opn.].)

Judge Gary L. Paden conducted the resentencing hearing. After considering the *Miller* criteria, Judge Paden again imposed an LWOP sentence. Defendant contends the trial court misapplied the *Miller* criteria and argues his sentence constitutes cruel and unusual punishment under the Eighth Amendment. In supplemental briefing, defendant contends Proposition 57, the Public Safety and Rehabilitation Act of 2016 (Proposition 57) passed by the voters on November 8, 2016, applies retroactively to his case. Defendant argues the initiative ended the practice employed here of allowing the prosecutor to directly file a case involving a juvenile offender in adult criminal court rather than first conducting a suitability hearing as now required by the amended provisions of the Welfare and Institutions Code. As we explain in the unpublished portion of this opinion, the trial court properly evaluated the *Miller* criteria. In the

2.

published portion, we conclude the suitability hearing provisions of Proposition 57 are not retroactive.

**FACTS AND PROCEEDINGS**[*]

***Trial and First Sentencing Hearing***[1]

On September 9, 2009, three months after Maria Juarez was murdered, defendant was charged in an information as an adult in criminal court pursuant to Welfare and Institutions Code former section 707, subdivision (d)(1), with first degree murder (Pen. Code, § 187, subd. (a)) committed during the commission of a robbery (*id.*, § 190.2, subd. (a)(17)), a special circumstance. The information alleged defendant personally used a deadly weapon in the commission of his offense (*id.*, § 12022, subd. (b)(1)). This information was filed five weeks prior to defendant's 18th birthday.

On May 5, 2010, the trial court suspended proceedings pursuant to Penal Code section 1368 to determine defendant's competency to stand trial. On June 7, 2011, a jury found defendant competent to stand trial, and the trial court reinstated criminal proceedings.

On September 14, 2011, a jury was impaneled. On September 20, 2011, the jury found defendant guilty as charged. In the first appeal this court noted: "There is no doubt [defendant] committed the murder. He confessed to the crime, his DNA was found at the scene as the result of a wound he suffered during the murder, and Juarez's and [defendant]'s DNA was found on the murder weapon that was hidden in his bedroom." (*People v. Marquez*, *supra*, F063837.)

Defendant then withdrew his previous plea of not guilty by reason of insanity. On October 19, 2011, the trial court imposed a prison sentence of LWOP.

_____

[*]See footnote, *ante*, page 1.

[1]We have augmented the record with selected portions of the record of defendant's trial and related proceedings from his first appeal, including our opinion in *People v. Marquez*, *supra*, F063837. Both parties requested we take judicial notice of the entire record in the first appeal. We grant the parties' motion to take judicial notice of the trial proceedings to the extent they are relevant to the issues raised in this appeal.

In the first appeal we held "[b]ecause *Miller* had not yet been decided, the trial court sentenced [defendant] without fully considering the implications of the Eighth Amendment. Undoubtedly, the trial court considered some of the *Miller* factors. It is clear, however, other factors were not considered or were found to have little weight in the sentencing decision, even though *Miller* suggests otherwise. For these reasons, we feel compelled to reverse the judgment and remand the matter for resentencing to satisfy the constitutional concerns raised by *Miller*." (*People v. Marquez*, *supra*, F063837.)

We further advised the trial court: "On remand, the trial court must give thorough consideration to the *Miller* factors, many of which readily appear in this record." (*People v. Marquez*, *supra*, F063837.) These included: (1) the "virtual unanimous conclusion of the five mental health professionals" that defendant suffered borderline intellectual functioning, substance abuse, and psychiatric disorders, including posttraumatic stress disorder, and schizoaffective disorder bipolar type, (2) a long history of psychiatric treatment and prescribed medication, (3) physical and emotional abuse detailed in psychiatric evaluations, (4) the motive for the crimes, (5) strong evidence of the "'incompetencies associated with youth'" that appear in the record, including (a) defendant refusing to request the assistance of counsel, (b) defendant providing the only evidence that allowed the jury to find the special circumstance of robbery to be true, (c) defendant confronting and refusing to assist his attorney, thereby hampering his defense, and (d) defendant refusing to attend most of the trial despite the encouragement of the trial court and counsel to do so, and (6) the possibility of rehabilitation, including defendant's remorse, if any, and potential for growth and change. (*People v. Marquez*, *supra*, F063837.)

***Probation Officer's Report from 2014***

Defendant was 22 years old when a new probation report was prepared. Defendant admitted to the probation officer he was present when Juarez was murdered, but others were present as well. Defendant declined to say whether he personally stabbed

Juarez. Defendant expressed to the probation officer some insight into the consequences of his actions, admitting he "'had it good'" before the crime and subsequent incarceration. Defendant realized he lost the opportunity to go to college and have a family life because of the decisions he made. In 2009, defendant had told officers he confronted Juarez because she had disrespected him a few weeks earlier. Although defendant regretted the crime, he did not directly admit his own culpability.

Defendant had three juvenile delinquency adjudications. In 2006, when defendant was 14 years old, he had a seven-year-old girl staying within the family home orally copulate him (Pen. Code, § 288a, subd. (b)(1)). In 2008, defendant exposed his erect penis to a female staff member of a group home (*id.*, § 314, subd. 1). Also in 2008, defendant was adjudicated for committing battery on a female staff member of a group home (*id.*, § 242). Defendant was on probation for these offenses when he murdered Maria Juarez.

On January 31, 2014, defendant and five other inmates allegedly attacked another inmate in county jail. Defendant claimed the victim had raped his cousin. The jail victim required two staples to close the wound on his head. Defendant was charged with felony assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), felony battery with serious bodily injury (*id.*, § 243, subd. (d)), and personal infliction of great bodily injury (*id.*, § 12022.7, subd. (a)). On March 29, 2014, defendant and another inmate attacked a third inmate without provocation. Defendant inflicted minor facial injuries and was charged with misdemeanor battery (*id.*, § 242). A confidential informant reported defendant was a bully who had stolen canteen items from the victim during a fight a few months earlier.

The probation officer's report also included a discussion of defendant's dysfunctional and abusive home environment. Defendant never knew his father. Defendant and his siblings raised themselves. Defendant's stepfather molested him and his older half sisters. Defendant described his home environment as angry, abusive, and

5.

full of drugs and gangs. Juvenile probation reports, however, document that as a minor, defendant received counseling to address his mental health, sexual abuse, and anger management issues. Defendant reported he was diagnosed with paranoid schizophrenia, bipolar disorder, and attention deficit hyperactivity disorder when he was very young. Defendant was taking psychotropic medication until one month before murdering Juarez. Defendant told the probation officer he stopped taking his medications against the advice of medical staff two and one-half years ago.

When defendant was first interviewed by probation in 2011, he chose not to comment about his involvement in this offense. However, defendant asked the court for leniency based on the fact he was only 17 years old when the crime was committed and he had matured since then. When interviewed on July 1, 2014, defendant expressed remorse for his decisions, said he was not the only person present during the homicide, and declined to admit he personally stabbed the victim. Defendant said at age 17, he could not fully appreciate the ramifications and consequences of his actions.

In expressly evaluating the *Miller* criteria and applying them to defendant's case, the probation officer noted defendant had little support from his mother, who lacked basic parenting skills. Defendant's mother was involved with drugs and dysfunctional relationships. Defendant quit school in the tenth grade. Defendant's juvenile adjudications began with a sex offense perpetrated on a girl only seven years old. Defendant had other juvenile adjudications and a history of fights while detained as a juvenile. The probation officer noted the abuse defendant suffered as a child, but observed defendant still had not expressed remorse or accepted personal responsibility for killing Juarez.

The probation officer asked whether defendant "is that rare juvenile described by the *Miller* court whose crime and background reflects his or her irreparable corruption." The probation officer concluded defendant's crimes as a juvenile, including the instant offense, involved a clear pattern of violence against women; his institutional conduct as a

6.

juvenile prior to his conviction also reflected a pattern of violence and open disobedience of authority figures. Furthermore, defendant was on juvenile probation when he committed the instant offense. Defendant received counseling to address his mental health and sexual deviance issues. Despite rehabilitative efforts, defendant continued his pattern of assaultive behavior and murdered Juarez. The probation officer concluded defendant was not amenable to rehabilitative services offered to him as a juvenile and met the threshold of a juvenile who could be given an LWOP sentence under *Miller*.

***Expert Testimony Concerning Defendant's Mental State***

Physicians and clinical psychologists testified at defendant's competency trial in February 2011. A psychiatrist and clinical psychologist testified at defendant's trial. Judge Paden read the transcripts of these proceedings in preparation for defendant's resentencing hearing. We summarize this testimony as follows.

Dr. Michael Barnett, a psychiatrist, treated defendant in 1997 and 1998. Defendant was taking Ritalin, but Dr. Barnett thought he needed a higher dosage. Dr. Barnett did not initially observe defendant having psychotic or suicidal ideation, but did find him talkative, hyperactive, and noisy. Two months after first seeing defendant, Dr. Barnett prescribed the mood stabilizer Depakote to control defendant's impulsive and aggressive behavior. Defendant was acting wild and had angry outbursts. Defendant was hitting his head and pulling out his hair, which could be signs of suicidal ideation. Dr. Barnett added Imipramine as a medication for defendant's attention deficit disorder and increased his dosage of Ritalin.

Between January 1998 and April 1998, defendant was fighting, manipulating his parents, and had fears about going to school. Dr. Barnett prescribed Mellaril to decrease defendant's hyperactivity and aggressive behavior. Defendant was taken to the emergency room because he was hurting himself. He was also running into the street when cars were coming. Defendant was urinating and defecating in his pants. Defendant

7.

reported psychotic symptoms, including hearing voices. Dr. Barnett began a course of the antipsychotic medication Stelazine and increased the dosage.

By June 1998, however, Dr. Bartlett was concerned defendant could be having a severe anxiety problem rather than psychosis. Dr. Bartlett was also concerned defendant's mother was doing something to provoke the psychotic symptoms. Dr. Barnett thought something may have been happening to cause defendant to regress. In August 1998, Dr. Bartlett prescribed defendant Seroquel, another antipsychotic. In November 1998, defendant again presented psychotic symptoms, such as hearing voices, and he pulled a knife on his sister. Dr. Barnett prescribed Zyprexa for defendant. In December 1998, Dr. Barnett found defendant was sleeping better and was going to school two hours a day; he denied any psychotic symptoms. Dr. Barnett explained people with psychosis can require medication their entire lives; without treatment, their symptoms could recur.

Dr. Ari Kalechstein, a licensed psychologist with specialized training in neuropsychology and forensic psychology, testified as a defense expert. Dr. Kalechstein met defendant twice and administered multiple tests to evaluate his competency to stand trial. Dr. Kalechstein found defendant's overall IQ was 70, which was in the intellectually impaired range, and his verbal skills were 74, in the borderline impaired range. Defendant had the English language skills of a fourth grader. Dr. Kalechstein found impairment in defendant's ability to understand and appreciate his circumstances as related to his case. Defendant tested in the low range for ability to remember verbally presented material and the low average range for long-term memory.

Dr. Kalechstein disagreed with another doctor who had found defendant was malingering. Dr. Kalechstein found defendant had a history of mental illness predating the case. Dr. Kalechstein thought defendant suffered one or two traumatic brain injuries as a little boy. Dr. Kalechstein concluded defendant was developmentally disabled and unable to retain information in a mainstream learning environment. Dr. Kalechstein did

8.

not believe use of drugs and alcohol contributed to defendant's developmental disability or his low IQ.

Forensic and clinical psychologist Dr. Richard Kendall was appointed by the court to evaluate defendant's competency to stand trial. During his entire evaluation of defendant, Dr. Kendall did not detect any evidence of disorganized thinking or gross cognitive impairments. Dr. Kendall observed no delusions or hallucinations by defendant. Defendant did not present himself as someone with a bona fide serious psychotic illness. Dr. Kendall believed defendant was malingering and did not believe defendant's description of visual hallucinations was sincere. Furthermore, defendant had a history of substance abuse, including use of alcohol, marijuana, methamphetamine, cocaine, and Ecstasy. According to Dr. Kendall, it was not uncommon for individuals using these drugs to have brief periods where they experience auditory and visual hallucinations.

Dr. Kendall reviewed Dr. Kalechstein's report and noted that even with a low IQ, defendant was not necessarily incompetent to stand trial. Defendant was twice admitted to hospitals, once in 2001 and again in 2003, for mental health commitments. Dr. Kendall agreed defendant had a significant history of being treated for mental illness but still concluded defendant was "attempting to malinger psychiatric impairment" because he displayed no psychiatric impairment during his evaluation.

Dr. Richard Berkson, a staff psychiatrist at Corcoran State Prison, was also appointed to evaluate defendant's competency to stand trial and testified not at the sanity hearing but at defendant's trial. Dr. Berkson evaluated defendant in April 2011, when he was 19 years old. Dr. Berkson acknowledged defendant had volunteered he was severely abused as a child and had a history of psychiatric treatment that included hospitalization.

During his evaluation of defendant, Dr. Berkson asked him if it would be more advantageous for defendant to be found competent or incompetent. Rather than answer the question, defendant walked out of the evaluation. Although Dr. Berkson did not

9.

complete a full history and mental status examination, he evaluated defendant for 45 minutes and believed he had enough information to form an opinion of defendant's competency to stand trial. Dr. Berkson found defendant to be of average intelligence and able to respond appropriately to his questions. Defendant understood the nature of the proceedings against him, the consequences of a guilty verdict, and the roles of participants in criminal proceedings. Defendant had the ability to cooperate with his counsel in a rational manner. Dr. Berkson concluded defendant was competent to stand trial.

Dr. Berkson found defendant's description of auditory hallucinations credible, but not his description of visual hallucinations. Defendant's description of a sudden onset and then a cessation of hallucinations is not what happens to patients clinically. Dr. Berkson believed defendant was exaggerating his hallucinations to the point of being dishonest.

Defendant told Dr. Berkson he was not responsible for the crime because he could not remember anything. Although defendant did not know if he committed murder, if he had done so, it was because his doctor had taken him off his medications. Defendant also blamed his actions on his mental health disorder, his lack of medications, and his molestation as a child. Defendant repeatedly wanted to talk about the crime. It appeared to Dr. Berkson that defendant wanted to present himself as not guilty by reason of insanity. Dr. Berkson could find no evidence defendant suffered from a psychosis.

Dr. Berkson observed signs of a borderline personality disorder with antisocial features. Dr. Berkson thought defendant had some delusional thinking. Dr. Berkson found defendant had extremely limited insight and blamed others for his illness or his own actions. Dr. Berkson found this history consistent with posttraumatic stress disorder, which explained defendant's emotional numbing, nightmares, disturbed sleep, and hyperactivity. Dr. Berkson found no clear evidence defendant was developmentally

10.

disabled.  During the evaluation process, Dr. Berkson found defendant's thought process to be logical and coherent.

Dr. Yoseph Geshuri, a clinical psychologist, testified for the defense.  Dr. Geshuri was asked to assume a person had experienced physical or emotional abuse and had developed anxiety or suicidal thoughts.  Dr. Geshuri explained it would not be inconsistent for a person like that who also abused drugs and alcohol to experience a blackout in a stressful situation.  Defendant's description of the murder was the type of stressful situation that might cause a blackout.

### *Resentencing Hearing*

At the beginning of the resentencing hearing on October 22, 2014, defendant told Judge Paden he had asked his attorney not to present any further evidence because "you really can't defend undefendible [*sic*], … you can't justif[y] unjustifiable."  Defendant apologized for "everything" he had done.  Defendant said he knew he hurt the family but had been intent on holding onto his anger to protect himself.  Defendant explained to the court he intended to waive his right to appeal, accept responsibility for his actions, and "accept the sentence as handed down as justifiable."  Defendant said he was "at peace" with his decision, and Juarez's "family need[ed] justice."  Defense counsel stated he would "respect my client's wishes, and I'm going to submit."

Prior to imposing its sentence, the court discussed the factors that informed its decision to resentence defendant to LWOP, noting a "huge, huge factor" in its sentencing decision was defendant's prospect for rehabilitation.  The court observed that since defendant had been returned to county jail, he had three new assault cases at the jail, one felony and two misdemeanors.  The court found defendant was continuing a pattern of violent, aggressive behavior, and it appeared defendant failed to show rehabilitation, which was a major factor to the court.  The court also discussed the testimony of the mental health experts who testified at defendant's competency trial and at trial.  The court recognized there was no question defendant "grew up in a … troubled and very difficult

11.

childhood." The court cited Dr. Barnett's testimony as providing evidence defendant had taken antipsychotic medications while growing up, and defendant had "anger issues, antisocial behavior from a very early age."

The court found Dr. Kalechstein's opinion helpful because it provided evidence defendant had some impairments regarding intellectual capacity, which reduced his reasoning and understanding. Dr. Kalechstein also testified defendant had a serious mental illness and was developmentally disabled with a borderline impaired IQ. Dr. Kalechstein, however, disagreed with other doctors who testified defendant was malingering.

The court found Dr. Kendall's testimony informative based on defendant's description of his involvement in the crime. Defendant told Dr. Kendall he did not commit the crime, he was innocent, somebody else did it, and defendant tried to stop the crime. The court also noted Dr. Kendall testified defendant "could be malingering," and he did not believe defendant suffered from psychosis.

The court contrasted what defendant told Dr. Kendall about his involvement in Juarez's murder with what he told Dr. Berkson about his involvement. Defendant told Dr. Berkson he had no recollection of the attack, but if he did kill Juarez, it was because he had been taken off his medication and Juarez had disrespected him. The court noted defendant told three different stories about the murder: first, he did not murder Juarez; second, he had no recollection of the murder; and third, if he did commit murder, it was because the doctor had taken him off his medication. The court observed, "I don't find that the defendant—until today—has ever acknowledged his culpability or shown any remorse."

The court also found Dr. Berkson's testimony helpful because he explained defendant had a ready excuse to blame others and wash his hands of responsibility. The court explained Dr. Berkson's testimony was also helpful in understanding defendant's past history in terms of his problems and the fact defendant was also a victim of an

assault as a child. The court considered this significant. The court noted both Drs. Berkson and Kendall believed defendant was not honest in describing his psychiatric symptoms.

The court found Dr. Geshuri's testimony concerning how stress can cause a blackout to be of little help in his sentencing decision. The court discussed defendant's possible motive for the crime, noting, "The defendant was alone. There was no peer pressure. There's indications that the defendant felt that the woman had disrespected him and, therefore, it was a retaliation type crime." The court also found the facts indicated planning. The court described the nature of the murder as "horrific."

The court noted prior attempts by the juvenile court system to rehabilitate defendant had been unsuccessful, even with medication. The court found defendant had been "aggressive against women on … prior occasions" based on his felony oral copulation of a minor as well as his violations for indecent exposure and battery involving female staff at a group home. The court recognized it had discretion under *Miller* to sentence defendant to LWOP or 25 years to life.

The court stated defendant was 17 years old when he committed this offense. Considering his maturity or lack thereof, the court considered (1) defendant's failure to appreciate the risks and the consequences of his actions, (2) defendant's family and home environment, (3) defendant's participation in the murder, and (4) defendant's rehabilitation. The court found the recent assaults in the jail to be significant in demonstrating whether defendant had the capacity to change and to overcome peer pressure. Taking all of these factors into account, the court considered whether the crime reflected an unfortunate yet transient immaturity, or was defendant's case "the type of case that—because it's rare that a juvenile offender would show traits in a crime that reflects irreparable, I-R-R-E-P-A-R-A-B-L-E, corruption, is this one of those uncommon cases where it's appropriate to sentence a juvenile to the harshest possible penalty?" The

court concluded it was, and it imposed an LWOP sentence. The court dismissed the pending new offenses committed in county jail in the interests of justice.

## DISCUSSION

**1.     Application of *Miller* Criteria on Resentencing**[*]

Defendant contends the trial court, in imposing an LWOP sentence, failed to properly apply the criteria set forth in *Miller*, our Supreme Court's opinion in *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*), and our opinion in his first appeal. Defendant argues the presentation of mixed questions of law and fact require de novo review of the trial court's ruling by this court. The People argue defendant has forfeited any review of the trial court's sentence, including on the ground it was cruel and unusual punishment, because he submitted the matter at sentencing and told the trial court he waived his right to appeal. The People further contend the trial court properly considered the criteria set forth in *Miller* and *Gutierrez.* We find the trial court applied the proper criteria in imposing a sentence of LWOP.

*Forfeiture*

The purpose of the forfeiture rule is to encourage parties to bring error to the attention of the trial court to allow it to be corrected. Constitutional rights are among those subject to forfeiture. (*People v. McCullough* (2013) 56 Cal.4th 589, 593.) A defendant's failure to object his or her sentence constitutes cruel and unusual punishment forfeits the claim on appeal if it is not raised in the trial court because it often requires a fact-bound inquiry. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1247.)

We observe there is a unique procedural posture here, which was not present in the above-cited cases. When there is a decision upon appeal, the trial court is reinvested with jurisdiction, "but only such jurisdiction as is defined by the terms of the remittitur." (*Hampton v. Superior Court* (1952) 38 Cal.2d 652, 655; see *People v. Lewis* (2004) 33 Cal.4th 214, 228.) "When an appellate court's reversal is accompanied by directions

_____

[*]See footnote, *ante*, page 1.

14.

requiring specific proceedings on remand, those directions are binding on the trial court and *must* be followed." Any material variance from the appellate court's directions is unauthorized and void. (*Butler v. Superior Court* (2002) 104 Cal.App.4th 979, 982.)

In making its ruling in the resentencing of defendant, the trial court was following our remand order, which it had the jurisdiction and duty to implement. The trial court's sentence unquestionably affected the substantial rights of defendant. We therefore review the trial court's ruling for error and to determine whether it complied with the requirements of *Miller*, *Gutierrez*, and our first opinion. This includes any Eighth Amendment challenge by defendant on appeal.

We further find, however, defendant must accept the record as it was before the trial court. On remand, defendant did not challenge the probation officer's reports or any fact relied upon by the trial court. Defendant is estopped from asserting error concerning the absence of potential additional evidence he failed to present to the trial court. Although defendant can challenge the court's application of *Miller*, *Gutierrez*, and our opinion in the first appeal, he has forfeited his right to include any factual information outside the record on appeal.

### *Miller and Gutierrez*

The United States Supreme Court has found a sentence of life in prison without the possibility of parole for a nonhomicide offense violates the Eighth Amendment's prohibition against cruel and unusual punishment if the offender was under 18 when the offense was committed. (*Graham v. Florida* (2010) 560 U.S. 48.)

In *Miller*, *supra*, 567 U.S. 460, the Supreme Court further held that a *mandatory* sentence of life in prison without the possibility of parole constituted cruel and unusual punishment for homicide offenses if the offender was under 18 at the time the homicide was committed. (*Id.* at p. 470.) Both *Miller* and *Graham* concluded that because juveniles had a diminished culpability and greater prospects for reform, they were

15.

different from adults and less deserving of the most severe punishments. (*Miller*, *supra*, at p. 471; *Graham v. Florida*, *supra*, 560 U.S. at p. 68.)

The *Miller* court was persuaded the scientific evidence showed significant gaps in development between children and adults. First, children lack maturity and have an underdeveloped sense of responsibility, which leads to recklessness, impulsivity, and heedless risk-taking. Second, children are more susceptible to negative influences and outside pressure from family and peers; they have limited control over their own environment and lack the ability to extricate themselves from horrific, crime-producing settings. Third, children cannot easily be identified as irretrievably depraved because their character is not as well formed as an adult's, and their character is more malleable than those of an adult's. (*Miller*, *supra*, 567 U.S. at p. 471.)

The physiology of juvenile and adult minds differs. The transient rashness, proclivity for risk, and inability to assess consequences lessens a juvenile's moral culpability and enhances the prospect that with age, neurological development will reform deficiencies. (*Miller*, *supra*, 567 U.S. at pp. 471-472.) Because a child is less blameworthy, the strength of the retribution rationale is reduced, and because a child is less likely to consider potential punishment when acting, the strength of the deterrence justification is reduced. (*Id.* at p. 472.) *Miller* held mandatory LWOP sentences for juvenile offenders were unconstitutional under the Eighth Amendment. *Miller* did not, however, foreclose the possibility of an LWOP sentence in homicide cases. (*Miller*, *supra*, at pp. 479-480.) As we noted in our first opinion, section 190.5, subdivision (b) does not impose a mandatory LWOP sentence on juvenile offenders who have committed homicide because it gives discretion to the trial court to sentence the juvenile to a term of 25 years to life. (*People v. Marquez*, *supra*, F063837.)

*Miller* explained mandatory LWOP sentences preclude consideration of a juvenile's chronological age and its hallmark features: (1) immaturity, impetuosity, failure to appreciate risks and consequences; (2) family and home environment

surrounding the juvenile, including the inability to extricate himself or herself from it no matter how brutal or dysfunctional it may be; (3) the circumstances of the homicide, including the extent of the juvenile's participation in the conduct and the way familial and peer pressures affected him or her; (4) the ability or inability of the juvenile to deal with police officers and prosecutors, as well as his or her ability to assist counsel; and (5) mandatory punishment disregards the possibility of rehabilitation even when circumstances most suggest it. (*Miller*, *supra*, 567 U.S. at pp. 477-478.) These criteria became the basis for our remand order for resentencing in defendant's first appeal.

Just before defendant was resentenced in this case, the California Supreme Court decided *Gutierrez*, where it held a sentencing court has discretion to sentence a juvenile convicted of first degree murder with special circumstances to LWOP or 25 years to life, with no presumption in favor of life without parole. *Gutierrez* found *Miller* requires the court, "in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender. [Citation.]" (*Gutierrez*, *supra*, 58 Cal.4th at p. 1361.) *Gutierrez* further held a sentencing court, in considering whether to impose an LWOP term, must consider the five factors enumerated in *Miller*. (*Gutierrez*, *supra*, at pp. 1389–1390.)

As for the standard of review, when a defendant makes a constitutional claim, courts of review still defer to the trial court's resolution of any disputed factual issues if supported by substantial evidence. (See generally *People v. Cromer* (2001) 24 Cal.4th 889, 902.) The underlying disputed facts must be viewed in the light most favorable to the judgment. The determination of whether a punishment is cruel or unusual is, however, a question of law for the appellate court to determine. (*People v. Em* (2009) 171 Cal.App.4th 964, 971; *People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) To the extent our analysis is a determination of law, we review that question independently of the trial court.

17.

***Immaturity and Impetuosity***

Defendant contends the trial court misapplied the criteria set forth in *Miller* and *Gutierrez*. Beginning with a juvenile's immaturity and impetuosity, defendant argues our opinion in the first appeal noted defendant hampered his defense by refusing to assist his own attorney. According to defendant, the trial court failed to address this point in its sentencing analysis. Defendant further argues he demonstrated impetuosity in submitting the matter at the resentencing hearing but later filing a notice of appeal from the trial court's sentence.

The trial court noted defendant was 17 years old when he murdered Juarez. Defendant was actually about four months shy of his 18th birthday when he committed homicide. Defendant was nearly an adult when he offended, which stands in contrast to the defendants in *Miller* who were 14 years old when they offended. (*Miller*, *supra*, 567 U.S. at p. 480, fn. 8.) The trial court extensively reviewed the testimony presented at defendant's competency trial, as well as two experts who testified at his criminal trial, and concluded there was no question defendant grew up in a very difficult and troubled childhood. The court found Dr. Berkson's testimony helpful in understanding defendant's past history in terms of his problems and the fact defendant was also the victim as a child of assault. The court found this fact to be significant. The court also explained it considered defendant's age as well as his maturity, or lack thereof, and his failure to appreciate the risks and consequences of his actions.

The court further found defendant had taken antipsychotic medications from an early age. The court noted, however, defendant exhibited anger and antisocial behavior during the same time frame. The court considered Dr. Kalechstein's testimony defendant had a serious mental illness and was developmentally disabled with a borderline impaired IQ. The court contrasted Dr. Kalechstein's testimony with testimony defendant was malingering some or all of his psychotic symptoms, failed to take responsibility for his crime, and told multiple stories of how Juarez was killed.

Although defendant emphasizes his failure to help his counsel and his change of mind about challenging his sentence as being immature and impetuous, these behaviors are also consistent with malingering. Obstruction of legal proceedings by criminal defendants is one hallmark of malingering. Defendant had prior adjudications as a juvenile and was not new to judicial proceedings. There is evidence defendant chose not to cooperate with counsel as an intentional strategy. Both Dr. Berkson and Dr. Kendall described defendant's conduct, even with regard to his psychotic symptoms, in the context of malingering. Toward the end of the time Dr. Bartlett was treating defendant for mental health disorders, he, too, began to question whether defendant's conduct was truly the product of psychotic symptoms or the product of defendant's home life. The trial court considered defendant's psychological profile in the complete context in which it was presented during the competency and criminal trials. The trial court had substantial evidence to support its findings concerning defendant's maturity and impetuosity.

### Defendant's Home Life

Defendant argues his home life was a situation from which he could not extricate himself. The trial court, however, considered defendant's home life. Judge Paden incorporated Judge Sevier's findings from the first sentencing hearing, which included the finding defendant had a horrible home life. Judge Sevier described defendant as having a relatively minimal criminal history and referred to defendant's age. Judge Paden also considered defendant's age.

The court did not dwell on defendant's home life, which was unquestionably bad throughout his childhood. The record of defendant's experience with mental health treatment, however, demonstrated defendant's mother was involved in getting him treatment when he was a minor and did not completely abandon him. Although defendant's mother was not a model caretaker, there was no evidence she was involved in violent crime, which was true of one of the *Miller* defendants. (*Miller*, *supra*, 567 U.S. at

19.

p. 478.)  The trial court was allowed to accord this factor the weight the court believed it deserved.

*Circumstances of the Homicide and Potential Conviction for Lesser Offense*

Defendant argues there was little evidence of meaningful planning.  Our first opinion noted the only evidence of defendant committing the special circumstance came from his confession.  Defendant seizes on this to assert there is no evidence of the special circumstance absent the competencies associated with youth.  Defendant argues the trial court failed to consider this factor.

There was substantial evidence of meaningful planning presented at defendant's trial.  Defendant stabbed and slashed the victim 19 times.  Three wounds were deep enough to puncture the left and right carotid artery as well as the right subclavian artery.  Defendant gave a statement to investigators that he killed the victim while trying to rob her.  There was further evidence defendant had a dispute with the victim because he believed she disrespected him on a prior occasion.  (*People v. Marquez*, *supra*, F063837.)

Defendant's conduct unquestionably showed an intent to kill.  The victim was apparently alone when defendant attacked her, and she was found dead in the early morning.  From these facts, we can reasonably infer defendant planned the crime, if only for a short time.  Defendant evidenced an intent to kill and harbored animus toward the victim from a previous encounter.  Together, these facts demonstrate intent to kill for revenge or some other motive.  They further demonstrate some degree of planning, even if the planning was not sophisticated.  From the DNA evidence found on the knife hidden in defendant's room, it is clear defendant was the perpetrator of the homicide, not a mere aider and abettor as was the case with one of the *Miller* defendants.  Also the *Miller* defendants were high on drugs and alcohol they had consumed with the adult victim. (*Miller*, *supra*, 567 U.S. at pp. 478-479.)  There is no evidence defendant was intoxicated during the commission of this murder.

20.

During the sentencing hearing, the trial court further noted defendant had three conflicting explanations for the crime: (1) he did not do it and was innocent, (2) he had no recollection of doing the crime because he blacked out, and (3) it was his doctor's fault for taking defendant off his medication. Defendant gave a fourth explanation when interviewed by the probation officer on July 1, 2014, expressing remorse for his decisions but adding he was not the only person present during the homicide. Defendant declined to admit he personally stabbed the victim. Except for this last and belated explanation of events, none of defendant's other stories involved action due to peer pressure. Instead, defendant acted alone.

Defendant's inconsistent explanations for his own conduct show not the incompetencies associated with youth, but a strong desire to deny culpability and responsibility for his conduct. We noted in the first appeal it was defendant's own admission supporting the special circumstance allegation. Many adults, however, also confess to serious crimes, admitting culpability for aggravating factors and special circumstances. We observe again defendant was *not* a newcomer to the criminal justice system and unacquainted with its procedures. Defendant had been adjudicated a juvenile delinquent three times in the past, once for a felony. Defendant had prior arrests, spent time in a juvenile detention facility, and committed two of his offenses while he was a resident in a group home.

### *Defendant's Mental Health Status*

Defendant argues our prior opinion described the "virtual unanimous" conclusion of five mental health professionals that defendant suffered from borderline intellectual functioning, mental health infirmities, psychiatric disorders, and substance abuse. Defendant portrays the trial court as only touching on these issues during the sentencing hearing. We disagree with defendant's characterization of the trial court's findings. We further note our remand order was not a conclusive set of factual findings, but a broad outline of the evidence to be evaluated by the trial court at the resentencing hearing.

21.

In addressing defendant's ability to reform, which we review in more detail *post*, the court also addressed defendant's complicated mental health history and the evaluations by the five doctors who testified during the competency and criminal trials. Dr. Kalechstein testified defendant had a serious mental illness, was developmentally disabled with a borderline impaired IQ, and suffered at least one traumatic brain injury as a young child. Dr. Geshuri explained it would not be inconsistent for a person who experienced physical and emotional abuse, like defendant, and who also abused drugs and alcohol, to experience a blackout in a stressful situation. Defendant's description of the murder was the type of stressful situation capable of causing a blackout.

Defendant's childhood psychiatrist, Dr. Barnett, testified he treated defendant for nearly two years for mental illness involving delusional thinking and auditory hallucinations. Dr. Barnett also treated defendant for psychosis. Later in his treatment of defendant, however, Dr. Barnett began to suspect defendant's symptoms were not derived from a psychosis but from great anxiety, possibly caused by something provoking the psychotic symptoms, perhaps by defendant's mother. Dr. Barnett thought something external may have caused defendant to regress. Dr. Barnett acknowledged that if a patient is psychotic, he or she may have to take medications an entire lifetime.

Dr. Kendall did not detect any evidence of disorganized thinking or gross cognitive impairments and did not observe any delusions or hallucinations by defendant. Defendant did not present himself as someone with a bona fide serious psychotic illness. Dr. Kendall believed defendant was malingering, and he did not believe defendant's description of visual hallucinations was sincere. Furthermore, Dr. Kendall noted defendant had a history of substance abuse, including use of alcohol, marijuana, methamphetamine, cocaine, and Ecstasy. According to Dr. Kendall, it was not uncommon for individuals using these drugs to have brief periods where they experience auditory and visual hallucinations. Dr. Kendall agreed defendant had a significant history for being treated for mental illness but still concluded defendant was "attempting to

22.

malinger psychiatric impairment" because he displayed no psychiatric impairment during his evaluation.

Dr. Berkson acknowledged defendant had been severely abused as a child and had a history of psychiatric treatment, including hospitalization. During his evaluation of defendant, Dr. Berkson asked if it would be more advantageous to defendant to be found competent or incompetent. Rather than answering the question, defendant walked out of the evaluation. Dr. Berkson found defendant to be of average intelligence and able to respond appropriately to Dr. Berkson's questions. Defendant understood the nature of the proceedings against him, the consequences of a guilty verdict, and he understood the roles of participants in criminal proceedings. Defendant had the ability to cooperate with his counsel in a rational manner.

Dr. Berkson found defendant's description of auditory hallucinations credible, but not his description of visual hallucinations; defendant's description was not how these types of hallucinations present. Dr. Berkson believed defendant was exaggerating his hallucinations to the point of being dishonest. Defendant told Dr. Berkson he was not responsible for the crime because he could not remember anything. Although defendant did not know if he had committed murder, if he had done so, it was because his doctor had taken him off his medications. Defendant blamed his actions on his mental health disorder, lack of medications, and molestation as a child. Defendant repeatedly wanted to talk about the crime. It appeared defendant wanted to present himself as not guilty by reason of insanity, but Dr. Berkson could not find any evidence defendant suffered from psychosis.

Dr. Berkson observed signs of a borderline personality disorder with antisocial features, and he believed defendant had some delusional thinking. Dr. Berkson found defendant had extremely limited insight and blamed others for his illness or his actions. Dr. Berkson found this history consistent with posttraumatic stress disorder, which explained defendant's emotional numbing, nightmares, disturbed sleep, and

23.

hyperactivity.  Dr. Berkson found no clear evidence defendant was developmentally disabled.  During the evaluation process, Dr. Berkson found defendant's thought processes to be logical and coherent.

The trial court reviewed all of this evidence and referred to it in making its findings.  Although defendant suffered from some mental illness, it is not clear to what degree, if any, he was psychotic.  Two medical experts were sure defendant was either partially or completely malingering his psychotic symptoms.  Defendant's borderline intelligence, however, was not enough to impair his ability to understand the nature of the proceedings or to assist his counsel.  Dr. Berkson found no developmental disability and noted defendant's thought processes were logical and coherent.

Dr. Berkson also believed defendant was attempting to manufacture a defense of guilt by reason of insanity.  Defendant's conduct in walking out of his evaluation with Dr. Berkson after being asked whether it would be more or less advantageous for him to be found incompetent further indicates a cool calculation by defendant.  Although such behavior can be indicative of mental illness, immaturity, or impetuous behavior, it can also demonstrate a shrewd calculation by defendant not to be further interviewed by a doctor detecting defendant's manipulation of the process.

The trial court had to weigh and evaluate all the evidence of defendant's psychological and psychiatric history.  There was substantial evidence defendant suffered from mental illness, either due to some form of psychosis or from posttraumatic stress.  There was further evidence, however, that defendant was a manipulative and calculating malingerer who exaggerated his symptoms in an attempt to minimize his culpability for committing a heinous murder.  We do not find error in how the trial court evaluated the testimony and evidence presented by the mental health experts.

***Evidence of Rehabilitation***

Defendant argues the trial court misevaluated evidence of his remorse and rehabilitation.  Defendant argues the trial court referred to three pending charges when

24.

there were apparently only two. Defendant takes issue with the trial court's reference to offenses he committed in jail because the court got the number of offenses wrong and defendant was not convicted of those offenses.

Although defendant had pending charges for a felony assault and a misdemeanor battery, a confidential informant told investigators defendant acted as a bully and stole canteen items from an inmate during a fight that occurred months earlier. The court's reference to three assaults in jail was not technically accurate because there were only two alleged assaults. There were, however, three incidents including the theft that involved bullying conduct by defendant. We also find defendant's argument of not having been convicted of the pending assault allegations to be unpersuasive. Defendant's conduct in jail prior to resentencing was relevant to the trial court's determination of defendant's ability to mature, to comport with jail rules, to be civil, and whether he could be rehabilitated. Defendant appeared to be acting in concert with others in the felony assault in jail in an act of revenge for a perceived crime against a member of his family when he assaulted a fellow inmate. The trial court did not rely on this factor alone in imposing an LWOP sentence.

As noted *ante*, the trial court carefully evaluated many other factors in imposing sentence, including defendant's mental health history, his troubled family life as a child, and his status as a minor. Judge Paden also considered defendant's prior adjudications as a minor for a felony sex offense on a victim only seven years old, for exposing himself, and for assaulting female staff of a group home. We disagree with Judge Sevier's observation in the first sentencing hearing that this was a minor juvenile record. Judge Paden found defendant's criminal history as a juvenile were all offenses directed toward women, as was the instant offense, which the court described as horrific. Defendant's increasing violence leading to murder and his crimes against women present a disturbing pattern of criminality. There is substantial evidence in the record to support each of

25.

Judge Paden's findings, and defendant was not sentenced with the presumption his sentence would be LWOP.

Judge Paden pointed out a further troubling aspect of defendant's conduct. Defendant has failed to demonstrate genuine remorse. Defendant told investigators, medical examiners, and the probation officers four different accounts of what happened. Most recently, defendant expressed to the probation officer remorse for his decisions, but he asserted he was not the only person present during the homicide. Defendant declined to admit he personally stabbed the victim. At the sentencing hearing, defendant finally appeared to accept responsibility for his actions but he did so without acknowledging personal culpability for killing Juarez. Defendant has never consistently accepted responsibility or remorse for his conduct, even as an adult.

As long as the trial court gives due consideration to an offender's youth and attendant characteristics as required by *Miller*, "it may, in exercising its discretion under Penal Code section 190.5, subdivision (b), give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case." (*People v. Palafox* (2014) 231 Cal.App.4th 68, 73.) After the trial court considers the transient immaturity of youth, and thoughtfully weighs other sentencing factors, the court can impose an LWOP sentence. The possibility of rehabilitation is not dispositive or even the preeminent factor to be weighed by the trial court. (*Id.* at pp. 90-91.) The trial court here thoughtfully weighed the appropriate criteria, including defendant's youth and its attendant circumstances, and found in defendant irreparable corruption. The court implicitly found defendant was unfit to reenter society.

We cannot say the trial court exceeded the bounds of reason, all circumstances considered. (*People v. Palafox*, *supra*, 231 Cal.App.4th at p. 91.) As required by *Miller*, the trial court here "consider[ed] all relevant evidence bearing on the 'distinctive attributes of youth'… and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.' [Citation.]" (*Gutierrez*, *supra*,

58 Cal.4th at p. 1390.) The court "'[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison.' [Citation.]" (*Ibid*.) We conclude the sentence imposed by the trial court did not violate the federal or state Constitution. (*People v. Palafox*, *supra*, at pp. 91-92.) We note under recently enacted legislation, however, defendant will be entitled to petition for the recall of his sentence in the future and, if not resentenced, he may file additional petitions for recall of his sentence. (See Pen. Code, § 1170, subd. (d)(2), (d)(2)(H).)

## 2. Retroactivity of Proposition 57

Approximately three months after Maria Juarez was murdered, the district attorney's office directly charged defendant in criminal court with first degree murder, pursuant to Welfare and Institutions Code section 707, subdivision (b).[2] Proposition 57, passed by the voters on November 8, 2016, no longer permits a prosecutor to direct file serious felony cases involving juveniles in adult criminal court. The parties have filed supplemental briefing on the issue of whether Proposition 57 applies retroactively to compel a juvenile court to conduct a fitness hearing to determine if a juvenile can be tried in adult criminal court. Defendant argues the initiative effectively reduces his punishment and provides an affirmative defense to the direct filing procedure and should therefore be applied to him retroactively. The People contend the law is prospective, it changes only juvenile court procedure, and it does not affect the penalty imposed. We agree with the People and the recent decision from the First District Court of Appeal in *People v. Cervantes* (2017) 9 Cal.App.5th 569 (*Cervantes*) and the Sixth District Court of Appeal in *People v. Mendoza* (2017) 10 Cal.App.5th 327 (*Mendoza*).

### *Juvenile Provisions of Proposition 57*

Before a minor could be tried in adult court, California historically required a finding of unfitness for juvenile court. (*Cervantes*, *supra*, 9 Cal.App.5th at p. 595; *Juan*

---

[2]Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

*G. v. Superior Court* (2012) 209 Cal.App.4th 1480, 1489.) Beginning with the passage of Proposition 21 in March 2000, the district attorney was authorized as a matter of executive discretion to file an action against a juvenile directly in adult criminal court under certain defined circumstances. This practice is known as "direct filing" or "discretionary direct filing." (*Cervantes*, *supra*, at p. 596.) The procedural change in how cases were formerly filed initially in juvenile court withstood constitutional challenges that it violated the separation of powers between the executive and judicial branches of government and due process of law under the federal and state constitutions. (*Manduley v. Superior Court* (2002) 27 Cal.4th 537, 551-573 (*Manduley*).) Our Supreme Court further rejected challenges to the statutory scheme as violating equal protection. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 835-841.)

The purpose of Proposition 57 with regard to juvenile offenders is to undo Proposition 21. The charging instrument for all juveniles must now be filed in juvenile court. Prosecutors may still move the court to transfer certain categories of cases to criminal court, but the juvenile court is vested with the sole authority to determine whether a juvenile should be transferred. Juveniles accused of felonies are guaranteed a right to a fitness hearing before being sent to the criminal division of superior court to be tried as an adult. (*Cervantes*, *supra*, 9 Cal.App.5th at pp. 596-597.)

### *Proposition 57's Silence on Retroactivity*

Defendant contends section 602 was amended to provide exclusive jurisdiction in juvenile court, and section 707 was amended to require a fitness hearing in juvenile court as a prerequisite to transferring a case to adult court.

The People point out that in contrast to the amendments to sections 602 and 707, which are silent on the issue of retroactive application, the constitutional amendment to article I, section 32 of the California Constitution, set forth in section 3 of Proposition 57, expressly changes adult sentencing to make nonviolent adult offenders eligible for parole consideration after completing the term of his or her primary offense. (Voter Information

Guide, Gen. Elec. (Nov. 8, 2016) p. 141.) The People analyze various statements in the voter guide to show the juvenile provisions are meant to be prospective. The voter pamphlet refers to transfers from juvenile court to adult court that "should" occur. (*Id*., at pp. 54, 56, 58, 141-146.) This ballot pamphlet may indicate intent for prospective application of juvenile transfer procedures but, at best, it is ambiguous. The statutory changes to sections 602 and 707 and the sections implementing them are silent on the issue of retroactivity.

We therefore begin our analysis with Penal Code section 3, which provides that "[n]o part of it is retroactive, unless expressly so declared." "Whether a statute operates prospectively or retroactively is, at least in the first instance, a matter of legislative intent. When the Legislature has not made its intent on the matter clear," this section provides the default rule. (*People v. Brown* (2012) 54 Cal.4th 314, 319 (*Brown*).) Defendant concedes Proposition 57 is silent on the question of whether it applies retroactively to proceedings under the act. The analysis of Proposition 57 by the legislative analyst and the arguments for and against Proposition 57 are also silent on this question. (Voter Information Guide, *supra*, at pp. 54-57, 141-146; see *People v. Buford* (2016) 4 Cal.App.5th 886, 918-920 (conc. opn. of Peña, J.) [analyzing silence of Prop. 47 on question of retroactivity], review granted Jan. 11, 2017, S238790.) Because the statute contains no express declaration that sections 602 and 707 apply retroactively to proceedings under the act, and there is no clearly implied intent of retroactivity in the legislative history, the default rule under Penal Code section 3 applies.

***Procedural Function of Superior Court Under Proposition 57***

Section 602 now reads: "Except as provided in Section 707, any person who is under 18 years of age when he or she violates any law of this state or of the United States or any ordinance of any city or county of this state defining crime other than an ordinance establishing a curfew based solely on age, is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

As noted in *Cervantes*, revised section 602 does not use the term "exclusive" and assigns jurisdiction over all juvenile criminal matters to the juvenile court, explicitly subject to the exceptions in section 707. Subdivision (b) of section 707 lists 30 serious crimes that subject even the youngest juveniles for criminal prosecution under section 707, ages 14 and 15, to adult prosecution. The court in *Cervantes* concluded for crimes that qualify a juvenile offender for transfer to adult court, "subject matter jurisdiction is concurrent between the criminal division and the juvenile division." (*Cervantes*, *supra*, 9 Cal.App.5th at p. 598.) *Cervantes* explained under the California Constitution the juvenile and criminal court are divisions of the superior court, which has subject matter jurisdiction over all criminal, civil, and juvenile matters. (*Cervantes*, at p. 598, citing Cal. Const., art. VI, § 10.)

Thus, when reference is made to the jurisdiction of the juvenile or criminal court, the reference does not refer to subject matter jurisdiction, but to the statutory authority of the particular division of the superior court in a given case to proceed under juvenile court law or generally applicable criminal law. (*Cervantes*, *supra*, 9 Cal.App.5th at p. 598.) Prior to the passage of Proposition 21 in March 2000, a procedure similar to the one enacted by Proposition 57 was used to transfer juveniles from juvenile to criminal court. In *Manduley*, our Supreme Court held this procedural change did not violate any constitutional principle. The transfer procedure changed with the passage of Proposition 21 and again with the passage of Proposition 57. The superior court retained fundamental subject matter jurisdiction under either procedure.

### *Punishment and the* **Estrada** *Rule*

Defendant cites *In re Estrada* (1965) 63 Cal.2d 740 to argue retroactive application.

In *Estrada*, the court stated:

> "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission

of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply. The amendatory act imposing the lighter punishment can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final. This intent seems obvious, because to hold otherwise would be to conclude that the Legislature was motivated by a desire for vengeance, a conclusion not permitted in view of modern theories of penology." (*In re Estrada*, *supra*, 63 Cal.2d at p. 745.)

*Cervantes* analyzed *Estrada* and noted Estrada had escaped from the California Rehabilitation Center without force or violence when the offense required a minimum one-year additional sentence and a two-year minimum after being returned to custody before parole consideration. (*In re Estrada*, *supra*, 63 Cal.2d at p. 743; *Cervantes*, *supra*, 9 Cal.App.5th at p. 599.) Between the time of the escape and the time Estrada was convicted, however, the governing statutes were amended to reduce the minimum term to six months for nonviolent escape and to require no minimum period before parole consideration. (*Estrada*, *supra*, at pp. 743–744; *Cervantes*, *supra*, at p. 600.) Estrada was being held in custody solely because of the minimum terms required by the former version of the statute and would have been entitled to release under the new version. (*Ibid*.)

Finding the reduction in penalty amounted to a legislative decision the prior law had been too harsh, the court held the amended statutes applied to the petitioner. "'[L]egislative mitigation of the penalty for a particular crime' called for the retroactive application of the reduced penalty, effectively establishing a rule that any law reducing the penalty for a crime was intended to apply to all nonfinal judgments. ([*In re Estrada*, *supra*, 63 Cal.2d] at p. 745; see also *People v. Conley* (2016) 63 Cal.4th 646, 656 [*Estrada*'s holding 'reflects a presumption about legislative intent, rather than a constitutional command'].)" (*Cervantes*, *supra*, 9 Cal.App.5th at p. 600.)

Defendant argues Proposition 57 amounts to a reduction in punishment, requiring us to find the law retroactive pursuant to *Estrada*. As *Cervantes* explained, however, the

31.

change in the law is procedural in nature and does not affect punishment. As noted in *Cervantes*, the passage of Proposition 115 in 1991 gave judges in criminal trials the power to conduct voir dire instead of attorneys. (*Cervantes*, *supra*, 9 Cal.App.5th at p. 600.) In *People v. Tapia* (1991) 53 Cal.3d 282, 287, 288-289, the Supreme Court held most of the new procedures, including those relating to voir dire and reciprocal discovery, were not retroactive under *In re Estrada*. (*Cervantes*, *supra*, at pp. 600-601.) *Tapia* noted Proposition 115 changed the law, and these changes fell into four categories: (1) provisions changing the legal consequences of criminal behavior to the detriment of defendants; (2) provisions addressing the conduct of trials; (3) provisions clearly benefiting defendants; and (4) a single provision codifying existing law. (*People v. Tapia*, *supra*, at p. 297.) *Tapia* found categories 1 and 3 were subject to retroactivity analysis, but the procedural change to the law affecting the conduct of trials in category 2 was not retroactively applicable but prospective in nature. (*Id.* at pp. 297-301.)

Cervantes analyzed *Tapia* as follows:

"*Tapia* emphasized that the retroactivity exception turns on the type of legal change effectuated by the new or amended statute: changes in direct penal consequences like the one under consideration in *Estrada*, would call for retroactive application, while those like the one involved in *Tapia* that 'address the conduct of trials which have yet to take place, rather than criminal behavior which has already taken place' are to be applied prospectively. (*Tapia*, *supra*, at pp. 288–289.) Under that rubric, the transfer procedure dictated by Proposition 57 is not one that addressed 'criminal behavior which has already taken place,' but is more correctly identified as one 'address[ing] the conduct of trials which have yet to take place.' (*Tapia*, at p. 288.) This suggests its application should be prospective only." (*Cervantes*, *supra*, 9 Cal.App.5th at pp. 600-601, fn. omitted.)

The *Estrada* case was recently revisited by our Supreme Court in *Brown*, *supra*, 54 Cal.4th 314. *Cervantes* analyzed the holding in *Brown* and found the legislative change in *Brown* strongly supported prospective application. The legislative change addressed presentence conduct credits, a situation more closely linked to the length of punishment for an offense than Proposition 57. In *Brown*, the Supreme Court

32.

unanimously determined a jail inmate awaiting trial and sentencing should earn credits at the rate in effect when sentenced. (*Brown*, *supra*, 54 Cal.4th at pp. 317–330; *Cervantes*, *supra*, 9 Cal.App.5th at p. 601.) *Cervantes* noted *Brown* recognized a change in credit-earning ability would affect the length of a prisoner's time in custody and, in that sense, would have a direct effect on punishment, but nevertheless found *Estrada* was inapplicable. (*Brown*, *supra*, at pp. 323, 325; *Cervantes*, *supra*, at p. 601.)

*Brown* held: "*Estrada* is today properly understood, not as weakening or modifying the default rule of prospective operation codified in [Penal Code] section 3, but rather as informing the rule's application in a specific context by articulating the reasonable presumption that a legislative act mitigating the punishment for a particular criminal offense is intended to apply to all nonfinal judgments." (*Brown*, *supra*, 54 Cal.4th at p. 324.) "The holding in *Estrada* was founded on the premise that '"[a] legislative mitigation of the penalty *for a particular crime* represents a legislative judgment that the lesser penalty or the different treatment is sufficient to meet the legitimate ends of the criminal law."'" (*Id.* at p. 325.) In *Brown*, the court did not apply the *Estrada* rule because "a statute increasing the rate at which prisoners may earn credits for good behavior does not represent a judgment about the needs of the criminal law with respect to a particular criminal offense, and thus does not support an analogous inference of retroactive intent." (*Brown*, *supra*, at p. 325; see *Cervantes*, *supra*, 9 Cal.App.5th at pp. 601-602.)

Similarly here, *Estrada* does not control because Proposition 57's transfer of the fitness hearing procedure to juvenile court does not reduce punishment for a particular crime. *Cervantes* recognized that while Proposition 57 may have a substantive impact on time in custody in some cases, and sometimes a big impact, the transfer procedure required under the Welfare and Institutions Code "does not resemble the clear-cut reduction involved in *Estrada*." (*Cervantes*, *supra*, 9 Cal.App.5th at p. 601.) *Cervantes* found that although the juvenile court rather than the district attorney makes the decision

33.

to try a juvenile offender as an adult, we may presume many cases filed in juvenile court will still end up in adult court with adult penalties under Proposition 57 after the fitness hearing is held. *Cervantes* further found that Proposition 57 "mitigates the penalty for a particular crime even less directly than the jail credits at issue in *Brown*" and found the change in the law to be more analogous to the voir dire procedure in *Tapia*, "which affected who performed a particular function in the judicial process." (*Cervantes*, *supra*, at pp. 601-602.) *Cervantes* concluded Proposition 57 "may or may not in some attenuated way affect punishment, but it is not a direct reduction in penalty as required for retroactivity under *Estrada*." (*Cervantes*, at p. 602, citing *Brown*, *supra*, 54 Cal.4th at p. 325.)

*Cervantes* was followed by *Mendoza*, *supra*, 10 Cal.App.5th 327, which also held the *Estrada* rule does not apply to make Proposition 57 retroactive. Like *Cervantes*, *Mendoza* found Proposition 57 is distinguishable from the laws at issue applying the *Estrada* rule first because "Proposition 57 does not expressly mitigate the penalty for any particular crime." (*Mendoza*, *supra*, at p. 348.) Instead, it changes the procedural mechanism for transferring juvenile offenders to adult court. Citing to *Brown*, *Mendoza* reasoned the *Estrada* retroactivity rule is not applicable to any amendment that may reduce a punishment, but is directed to statutes representing legislative mitigation of the penalty for a specific crime. (*Mendoza*, at p. 348; *Brown*, *supra*, 54 Cal.4th at p. 325.)

*Mendoza* also found that "Proposition 57 provides no certainty that a minor will actually receive a mitigated penalty because juvenile courts have discretion under Proposition 57 to transfer juvenile cases to adult court." The penalty for all cases transferred to adult court "will be the same as they were before Proposition 57." (*Mendoza*, *supra*, 10 Cal.App.5th at p. 348.)

*Mendoza* analyzed the Supreme Court's decision in *People v. Francis* (1969) 71 Cal.2d 66 where the defendant committed a drug offense that was later amended by the Legislature from being punished only as a felony to being punished as a wobbler.

34.

*Francis* applied the *Estrada* rule, reasoning that although the amendment did not guarantee Francis a lower sentence, making the specific crime a misdemeanor demonstrated a legislative intent that punishing the offense as a felony might be too severe in certain cases. (*People v. Francis*, *supra*, at p. 76; *Mendoza*, *supra*, 10 Cal.App.5th at p. 348.) *Mendoza* found the legislative change in *Francis* distinguishable from Proposition 57, "because it involved a legislative mitigation of the potential punishment for a specific crime. Where, as under Proposition 57, the potential benefit inures to a class of offenders based on their age rather than on the offenses they commit, the inference that voters deemed the entire Penal Code unduly severe when applied to minors is too attenuated to support application of the *Estrada* rule." (*Mendoza*, *supra*, 10 Cal.App.5th at pp. 348-349.)

Contrary to *Cervantes* and *Mendoza*, *People v. Vela* (Apr. 24, 2017, G052282) __ Cal.App.5th __ (*Vela*) [2017 Cal.App.LEXIS 379] held that Proposition 57 has retroactive application because the intent of the voters was to broaden the number of minors who could potentially stay in the juvenile justice system where the primary emphasis is on rehabilitation rather than punishment. (*Vela*, *supra*, at p. __ [2017 Cal.App.LEXIS 379 at pp. *9–*11].) *Vela* found the potential for reduction in punishment of a crime in *Francis* was analogous to the potential ameliorating benefit to minors after amendments to the Welfare and Institutions Code, and it held the *Estrada* rule applied to Proposition 57. (*Vela*, at p. __ [2017 Cal.App.LEXIS 379 at pp. *22–*23].)

We disagree with the *Vela* court's analysis of *Francis*, *Estrada*, and the retroactivity of Proposition 57. *Vela* expands the *Estrada* rule by finding a potential benefit inuring to a class of offender based on age rather than the offenses commited. We find persuasive the reasoning in *Mendoza* that "applying the *Estrada* rule to Proposition 57 would expand that rule in such a manner as to risk swallowing the general [Penal Code] section 3 presumption that legislation is intended to apply prospectively."

35.

(*Mendoza*, *supra*, 10 Cal.App.5th at p. 348, citing *Brown*, *supra*, 54 Cal.4th at pp. 324-325.)

We agree with the findings in *Cervantes* and *Mendoza* that no provision in the Welfare and Institutions Code enacted by Proposition 57 reduces any form of punishment under the Penal Code. The expressly retroactive constitutional revision in Proposition 57 applies only to adult offenders. The absence of express language making application of the Welfare and Institutions Code retroactive where the constitutional amendment is expressly retroactive demonstrates an intent by the voters to direct "the scope and manner of the Act's retroactive application." (See *People v. Conley*, *supra*, 63 Cal.4th at p. 658.) The Welfare and Institutions Code changes in the proposition effect a procedural change similar to procedures—such as voir dire being conducted by the trial court—noted in *Tapia*.

Defendant further argues Proposition 57 creates an affirmative defense that was unavailable during his trial, and the criminal division of superior court acted in excess of its jurisdiction because it did not afford him a proper transfer hearing upon a motion by the prosecutor as now required by amendments to the Welfare and Institutions Code. This argument assumes Proposition 57 is retroactive. We have determined it is not. Defendant's affirmative defense argument further inaccurately assumes the criminal court lacks subject matter jurisdiction over juvenile cases. As *Cervantes* explained, the juvenile and criminal courts are both divisions within the same superior court, which maintains fundamental subject matter jurisdiction over juvenile cases. Proposition 57 does not create an affirmative defense for juveniles who have already been tried in criminal court; it prospectively changes the procedural process for transferring a case to criminal court.

Due to numerous errors in Cervantes's trial, eight of 15 counts were reversed on appeal, including all counts with specific intent as an element of the offense. This included Cervantes's convictions for attempted murder, torture, aggravated mayhem, and

36.

two sex offenses.  (*Cervantes*, *supra*, 9 Cal.App.5th at p. 579.)  Because the court held the People could retry Cervantes on the reversed counts, placing him again in jeopardy, and given that Cervantes had to be resentenced even if the People elected not to retry him, the court found Cervantes was entitled on remand to a fitness hearing in juvenile court should he elect to have one.  (*Id.* at p. 609.)

The court's remand of *Cervantes* for further proceedings, thereby entitling him to a fitness hearing, turned the revised procedure into the prospective application of Proposition 57 for that defendant.  This case is procedurally distinguishable from *Cervantes*.  Defendant's convictions were affirmed in his first appeal to this court.  After remand for resentencing in light of *Miller*, defendant has appealed the trial court's reimposition of an LWOP sentence.  We have found no error in defendant's resentencing hearing and, thus, no basis for a remand.  We conclude that application of Proposition 57 to defendant is not retroactive, and he is not entitled to remand solely for a fitness hearing before the juvenile court.

### Constitutional Contentions

Defendant contends he is entitled to remand for a transfer hearing under federal due process and the Sixth Amendment.  Our Supreme Court rejected these contentions in *Manduley*.  (*Manduley*, *supra*, 27 Cal.4th at pp. 551-573.)

In *Kent v. United States* (1966) 383 U.S. 541, 556 (*Kent*), the high court considered a statutory scheme conferring original and exclusive jurisdiction on a juvenile court over minors accused of various crimes.  The law authorized the juvenile court to waive its jurisdiction and transfer the matter to criminal court after conducting an investigation, but no statutory criteria or procedures governed the juvenile court's determination to waive jurisdiction.  (*Id.* at p. 547; *Manduley*, *supra*, 27 Cal.4th at p. 565.)  *Manduley* found the decision in *Kent* held that a juvenile court violated the minor's due process of law in transferring the matter to criminal court without conducting a hearing or providing a statement of reasons for doing so.  In conducting such a hearing,

37.

the minor possessed the right to effective assistance of counsel, access to the records considered by the juvenile court, and a statement of reasons for the juvenile court's decision. (*Kent*, *supra*, at pp. 553-563; *Manduley*, *supra*, 27 Cal.4th at p. 565.)

In distinguishing the statute at issue in *Kent*, our Supreme Court in *Manduley* explained that California's juvenile law does not confer upon the juvenile court original and exclusive jurisdiction over minors accused of crimes under the circumstances set forth in section 707. Under this statute, "neither the juvenile court nor the criminal court renders a decision whether the minor is fit for a juvenile court disposition." (*Manduley*, *supra*, 27 Cal.4th at p. 565.) "Rather, as we have explained, the prosecutor's charging decision determines which court shall hear the matter." (*Ibid*.) *Manduley* rejected the petitioners' argument the procedural protections applicable to juvenile fitness hearings are mandated by *Kent* to apply also to the prosecutor's exercise of discretion to directly file charges in criminal court. *Manduley* distinguished prosecutorial discretion from judicial determinations. (*Manduley*, *supra*, 27 Cal.4th at pp. 565-566.)

> "*Kent*, *supra*, 383 U.S. 541, held only that where a statute confers a right to a *judicial* determination of fitness for a juvenile court disposition, the due process clause requires that the determination be made in compliance with the basic procedural protections afforded to similar judicial determinations. A statute that authorizes discretionary direct filing in criminal court by the prosecutor, on the other hand, does not require similar procedural protections, because it does not involve a judicial determination but rather constitutes an executive charging function, which does not implicate the right to procedural due process and a hearing." (*Manduley*, *supra*, 27 Cal.4th at p. 566.)

*Manduley* concluded the petitioners did not possess any right to be subject to the jurisdiction of the juvenile court, and the legislative branch could properly delegate to the prosecutor the discretion to determine where to filed charges against a minor, including directly with the criminal court.[3] (*Manduley*, *supra*, 27 Cal.4th at p. 567.) The decisions

---

[3]*Manduley* further rejected the petitioners' challenge to direct filing on equal protection grounds. (*Manduley*, *supra*, 27 Cal.4th at pp. 567-572.)

of our Supreme Court are binding.  (*Auto Equity Sales*, *Inc*. *v*. *Superior Court* (1962) 57 Cal.2d 450, 455.)  We therefore reject defendant's constitutional arguments.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
GOMES, Acting P.J.


_____
POOCHIGIAN, J.